UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| ANGELA VEURINK,<br><br>Plaintiff,<br><br>vs.<br><br>DR. JILL MURPHY<br><br>Defendant. | 18-4021<br><br>MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT |

Pending before the Court is Defendant, Dr. Jill Murphy's ("Dr. Murphy"), Motion for Partial Summary Judgment on Plaintiff, Angela Veurink's ("Ms. Veurink") claim for fraud and deceit. Doc. 23. For the following reasons, the motion is denied.

## FACTS

Dr. Murphy is a board-certified plastic surgeon, and during the events at issue in this case, practiced with Plastic Surgery Associates of South Dakota ("PSA") from August 2014 through April 2018. Doc. 25, ¶¶ 2, 3; Doc. 29, ¶¶ 2, 3.

On October 4, 2016, Ms. Veurink had her first appointment with Dr. Murphy for a plastic surgery consultation. Doc. 25, ¶ 1; Doc. 29, ¶ 1. During the October 4, 2016, appointment, Dr. Murphy and Ms. Veurink discussed an abdominoplasty ("tummy tuck") with liposuction and umbilical hernia repair. Doc. 25, ¶ 10; Doc. 29, ¶ 10. Although Dr. Murphy's medical notes from this visit do not mention breast surgery, Dr. Murphy and Ms. Veurink both recall that they discussed breast surgery. Doc. 25, ¶ 11; Murphy Dep. 44:11-25. While it is disputed as to exactly what Dr. Murphy and Ms. Veurink discussed during this initial meeting about her breast surgery, both Dr. Murphy and Ms. Veurink agree that Ms. Veurink talked about wanting to have a smaller breast size. Doc. 25, ¶ 11; Doc. 29, ¶ 11. Dr. Murphy testified during their first meeting, Ms. Veurink did not talk about submitting her breast reduction procedure to insurance, and Ms. Veurink testified that she and Dr. Murphy did not discuss insurance until her second visit. Murphy Dep. 41:5-23; Veurink Dep. 66:20-22. Dr. Murphy testified that because they had not talked about the breast surgery being billed through insurance, she gave Ms. Veurink a quote for a mastopexy, which is what Dr. Murphy calls a breast lift, with or without a breast reduction, when the patient is paying for the procedure out-of-pocket. Murphy Dep. 41:16-22.

1

A mastopexy is a breast lift and is typically done as a cosmetic or self-pay procedure with the stated goal of reducing the skin envelope so everything is lifted up higher on the breasts for a more aesthetic appearance. Doc. 25, ¶ 12; Doc. 29, ¶ 12; Steele Dep. 64:14-23; Murphy Dep. 10:6-12. In a mastopexy, the surgeon may remove some tissue, but it is mainly skin. Steele Dep. 66:10-12. Breast reductions, on-the-other-hand, can either be self-pay or covered by insurance and the purpose of a breast reduction is to make the breasts smaller. Steele Dep. 65:14-24; Murphy Dep. 41:16-23. Nearly all breast reductions include a breast lift and during Ms. Veurink's October 4, 2016, appointment, Dr. Murphy explained that her breast reduction would also include a breast lift. Doc. 25, ¶¶ 13, 14; Doc. 29, ¶¶ 13, 14.

If a breast reduction is a self-pay procedure, technically, there is no minimum amount of breast tissue that has to be removed before a procedure can qualify as a breast reduction. Steele Dep. 66:1-6. Dr. Steele testified that the goal of a breast reduction is to remove enough breast tissue, 300-800 grams, to make the breasts smaller for symptomatic relief. Steel Dep. 66:14-22; Jodi Pierret ("Ms. Pierret"), the clinic manager at PSA for 27 years, also testified that breast reductions generally have a larger amount of grams of tissue removed. Pierret Dep. 51:15-52:3. By contrast, Dr. Murphy testified that by definition, any amount of breast tissue that is removed from the breast qualifies as a breast reduction. Murphy Dep. 24:25-25:19 ("[W]hen you remove breast tissue, you are reducing the size of the breast. And so by definition, it is a breast reduction."). Dr. Murphy did acknowledge that just removing skin would be a mastopexy, not a breast reduction, but said "as part of a mastopexy, it is accepted that you can remove breast tissue and thereby perform a breast reduction as part of a mastopexy." Murphy Dep. 23:15-24:7. Dr. Murphy testified that there can be different volumes-small reductions and large reductions, but that any time you remove breast tissue, you are reducing the size of the breast. Murphy Dep. 25:11-25:19.

Dr. Murphy testified that the main difference between a mastopexy and a breast reduction, from a patient's perspective, is who is paying for it and whether there is a minimal amount of breast tissue that must be removed. Murphy Dep. 9:14-25. Dr. Murphy testified that if a patient is paying for the surgery out-of-pocket, "the amount of breast tissue taken out would be 100 percent based on what the patient's goal is" as they would not be required to take a minimum amount out

2

in order to qualify as a breast reduction surgery by the insurance company's standards. Murphy Dep. 80:25-81:24.

After Ms. Veurink's initial appointment with Dr. Murphy on October 4, 2016, Ms. Veurink received a price quote for the procedures she and Dr. Murphy had discussed. When Ms. Veurink saw "mastopexy" on the quote, she did not know what it meant and went online to research what it was and saw a lot of people referring to it as a breast lift. Ms. Veurink Dep. 71:16-19. On October 13, 2016, Ms. Veurink scheduled surgery at Rivers Edge Aesthetic Surgery ("REAS") for November 15, 2016, and a second consult visit with Dr. Murphy for November 1, 2016. Doc. 25, ¶¶ 32-35. Ms. Veurink testified that she wanted to be sure that she and Dr. Murphy were "on the same page as far as the breast reduction goes." Veurink Dep. 66:16-20. On October 28, 2016, the computerized scheduling information that REAS and PSA use to schedule clinic visits and surgeries shows that on October 28, 2016, Ms. Veurink changed the date of her surgery from November 15, 2016 to November 3, 2016. Doc. 27, ¶¶ 3, 4; Doc. 25, ¶ 32.

Ms. Veurink testified that during her November 1, 2016, consultation, Dr. Murphy asked her what size she wanted to be and that Ms. Veurink expressed that she would like to be a large B/small C. Ms. Veurink Dep. 74:7-12. Dr. Murphy's medical notes from the November 1, 2016, consultation state that "breast reduction was discussed in detail" and that Ms. Veurink expressed her desire to be a large B/small C. Preheim Aff., Ex. 6. Although Dr. Murphy and Dr. Steele testified that they never guarantee a patient will be a certain cup size after surgery because cup sizes can vary so much between brands of bras, they both testified that a patient's answer to this question can give them a frame of reference for how large the patient wants their breasts to be in proportion to their frame. Murphy Dep. 51:24-53:7; Steele Dep. 70:3-12. Given Ms. Veurink's DD breast size, reducing Ms. Veurink's breasts to a large B/small C would make Ms. Veurink's breasts smaller in proportion to her frame. Steele Dep. 51:23-52:4. Despite the fact that Ms. Veurink told Dr. Murphy that she wanted to be a large B/small C, Dr. Murphy testified that Ms. Veurink wanted to be proportional to her frame. Murphy Dep. 39:22-40:3; 53:8-12. Ms. Veurink testified that she recalled telling Dr. Murphy that "proportionality" was not something she was concerned about, but rather the alleviation of her symptoms. Veurink Dep. 80:21-25.

Although Ms. Veurink testified that Dr. Murphy told her during this visit that she could remove about 250 – 350 grams of tissue from each side of the breast, this fact is in dispute. Veurink

Dep. 74:10-12. Dr. Murphy acknowledges that she put these numbers in her medical notes that day, but contends that she did not inform the Ms. Veurink of these numbers because she always added them at the end of the day after she consulted a formula to help her estimate the amount of breast tissue that would need to be removed for insurance purposes. Murphy Dep. 70:5-8; 72:10-14.

Dr. Murphy's recollection of why Ms. Veurink returned for a second consultation on November 1, 2016, was that she wanted to get the procedure "[they] had talked about before, which was cosmetic breast lift . . . paid for by her insurance as a breast reduction." Murphy Dep. 38:19-23; Murphy Dep. 45:18-24. Dr. Murphy testified that she told Ms. Veurink that there was not really a difference in what they were going to do procedurally, but that they were going to try to get it covered by insurance. Murphy Dep. 38:16-21; 39:14-21; Doc. 25, ¶ 32 ("The procedure was not going to be any different . . . ."). Dr. Murphy stated that in order to get it covered by insurance, they needed to document the symptoms Ms. Veurink was experiencing from her large breast size such as open sores, back and neck pain. Murphy Dep. 38:24-39:6. PSA staff took photos to document the scars and sores under Ms. Veurink's breasts to submit along with the insurance pre-authorization form. Veurink Dep. 55:5-14. Dr. Murphy also documented in her medical notes the pain that Ms. Veurink was experiencing due to her large breasts and the alternative therapies that Ms. Veurink had tried which had not alleviated her symptoms. Preheim Aff., Ex. 6. There is no evidence in the record before the Court that Dr. Murphy told Ms. Veurink that insurance companies require a certain amount of breast tissue to be removed in order for it to be a covered service, just that she had to give the insurance company "an estimate of what [she] [thought] she could remove to bring Ms. Veurink down to a size which is the size she wanted to be and where she wanted to be proportionate to her frame.[1]" Murphy Dep. 39:22-40:3. Dr. Murphy testified that she told Ms. Veurink that "based on whatever that particular insurance company's requirements are—they all have different requirements to cover breast reduction, then it would be either approved or not approved," and that they could either appeal or do whatever else is required by the insurance company to get it covered. Murphy Dep. 40:10-24.

---

[1] If Ms. Veurink had known that the insurance company required a certain amount of breast tissue to be removed in order to cover the procedure, the Court finds that it can be reasonably inferred that she would not have declined to have the breast tissue removed during her surgery weighed by pathology.

4

During the November 1, 2016, visit, Dr. Murphy testified that she told Ms. Veurink that she was going to perform a breast reduction, but that they needed to submit to insurance and wait to hear what insurance said before they could determine if Ms. Veurink would be approved for a breast reduction. Murphy Dep. 135:4-20. Dr. Murphy told Ms. Veurink that she would ask for approval from the insurance company, but that if they did not get it, Dr. Murphy could perform the same procedure except that Ms. Veurink would pay for it out-of-pocket. Murphy Dep. 136:6-11. Ms. Veurink testified that it was her understanding that as long as PSA submitted the pre-authorization form to the insurance company, they could proceed with breast reduction surgery and that ultimately, whether the procedure was covered by insurance depended on how Ms. Veurink's insurer, Avera Health Plan, responded to her request for pre-authorization. Veurink Dep. 31:25-32:4; 32:18-21.

On November 2, 2016, a day before her surgery, Ms. Veurink paid PSA $10,685 for her surgery with the expectation that she would be reimbursed for amounts paid for the breast portion of her surgery if insurance approved the procedure. Veurink Dep. 69:1-21.

Ms. Pierret testified that once an insurance company receives a pre-authorization form for a breast reduction, it will respond in approximately 10-15 days with either an approval or a denial of the pre-authorization. Pierret Dep. 121:22-23. Ms. Veurink's November 3, 2016, surgery was already scheduled at the time of her November 1, 2016, follow-up appointment with Dr. Murphy. Doc. 25, ¶ 32 ("On October 28, 2016, at Veurink's request, the date of the surgery was changed from November 15, 2016, to November 3, 2016."). At the end of the November 1, 2016, consultation, Ms. Veurink was under the impression that she would not likely receive pre-authorization prior to her surgery, but that she could proceed with surgery as long as the pre-authorization form had been submitted. Veurink Dep. 76:5-10.

On November 3, 2018, the day of the surgery, the nursing staff at REAS, where the operation was performed, presented Ms. Veurink with informed consent forms to sign which included a bilateral formal mastopexy which Ms. Veurink understood from her discussions with Dr. Murphy to be the breast reduction. Veurink Dep. 112:18-25. Dr. Murphy told Ms. Veurink prior to surgery that they had not yet heard back from insurance and that she was giving Ms. Veurink the option of whether to send the breast tissue removed to insurance. Veurink Dep. 79:4-18; Preheim Aff., Ex. 6. Ms. Veurink decided that she did not want to send the breast tissue to

5

pathology because she knew that a pathology bill could be expensive and thought that she would save a little money in the event the insurance company denied coverage. Veurink Dep. 79:19-80:1. Dr. Murphy testified that it was her understanding when she went into the operating room that day, that Ms. Veurink wanted to proceed with the procedure out-of-pocket and that they were not going to attempt to get it covered by insurance. Murphy Dep. 212:18-23.

Although the tissue removed was not sent to pathology, REAS staff weighed the breast tissue in the operating room and documented it in the patient records. Preheim Aff., Ex. 10. Although Dr. Murphy signed the patient record containing the weight of the breast tissue, both she and Ms. Pierret testified that they were unaware that REAS weighed breast tissue independent of pathology if a claim was not being submitted to insurance. Murphy Dep. 213:1-3; Pierret Dep. 107:18-108:2; 128:11-16. The amount of breast tissue that was documented as having been removed was 101 grams from the right breast and 121 grams from the left breast. Preheim Aff., Ex. 10. Ms. Veurink testified that she assumed Dr. Murphy knew that at the time of surgery that the tissue that was removed had been weighed by REAS. Veurink Dep. 95:14-18.

After the surgery, Ms. Veurink logged into her online patient portal and noticed that there had yet not been a claim submitted to her insurance. Veurink Dep. 101:13-25. On November 28, 2016, and on several occasions thereafter, Ms. Veurink inquired of PSA as to why no claim had yet been submitted to insurance for her breast surgery. Veurink Aff., Ex. C. A breast reduction pre-authorization form was not completed by PSA and submitted to Ms. Veurink's insurer, Avera Health Plans, until more than a month after Veurink's surgery. Pierret Dep. 59:18-21; Preheim Aff., Ex. 7. Ms. Pierret testified that during her 27-year tenure with PSA, she was not aware of another instance in which the clinic submitted a pre-authorization form to an insurance company post-surgery. Pierret Dep. 1212:12-18. The pre-authorization form documented the date of Ms. Veurink's surgery as November 3, 2016, and stated that Ms. Veurink had bilateral macromastia and suffered from permanent shoulder grooving from bra straps, persistent intertrigo at the inframammary folds, and back pain, open sores under breasts with scarring. Preheim Aff., Ex. 7. The estimated breast tissue removed was documented as greater than or equal to 350 grams. Preheim Aff., Ex. 7.

Ms. Pierret testified that when attempting to complete the pre-authorization form, she did not find anything documented in Ms. Veurink's medical records to be considered a breast reduction

6

and so she spoke to Dr. Murphy about how many grams were removed. Pierret Dep. 65:15-23. Dr. Murphy stated that given she did not weigh the tissue "because [they] didn't do this with the intention of sending it to surgery," and since she alleges that she had no knowledge that the tissue had been weighed by REAS, the best she could do was estimate how much the breast tissue removed felt in her hand which, Dr. Murphy testified, is what she wrote in her addendum to the operative report. Murphy Dep. 209:11-210:10. Specifically, Dr. Murphy's addendum stated as follows:

> Addendum to original operative report. Breast tissue was removed from both the right and left breasts. Intra-op this amount of tissue felt consistent with about 350g per side.[2] Tissue was not sent to pathology per patient request.

Preheim Aff., Ex. 8.

Approximately 45 days after Ms. Veurink's surgery, PSA received the pre-authorization back from Avera Health Plans agreeing to insure Ms. Veurink's surgery as a breast reduction. Pierret Dep. 57:19-21. Thereafter, PSA submitted an insurance claim for a breast reduction on behalf of Ms. Veurink to Avera Health Plans. Pierret Dep. 57:17-21; 106:16-20; 115:6-11. The amount charged by PSA for the breast reduction that was submitted to insurance was $10,000, but pursuant to the contract that PSA had with Avera Health Plans, PSA was required to write off $6,446.66, so the procedure was approved for $3,553.34. Pierret Dep. 116:4-25.

Two months prior to Ms. Veurink's surgery, Dr. Murphy had become partner at PSA where she no longer received a salary, but rather a percentage of revenue she brought in minus her percentage of overhead and expenses. Pierret Dep. 91:9-11; 92:17-18; 98:6-9. If Ms. Veurink's breast reduction was billed through insurance, Dr. Murphy's compensation would be based on the $3,553.34 that the insurance company approved for the procedure, whereas the price for a mastopexy paid for out-of-pocket was $4,250, although Ms. Veurink received a 50% multiple procedure discount and was thus quoted $2,125 for the mastopexy. Pierret Dep. 68:3-18; 113:23-114:2; 117:7:10.

---

[2] Dr. Steele testified that he thought that "even a layperson could determine the difference" between the 350 grams of breast tissue that Dr. Murphy estimated having removed and the 101 and 121 grams of breast tissue that was removed. Steel Dep. 75:15-19.

7

After receiving the insurance proceeds from the breast portion of Veurink's surgery, PSA refunded Veurink $1,776.93 that she had paid out-of-pocket for the breast portion of the surgery. Pierret Dep. 115:12-15; Hinton Aff., Ex. Veurink 8.

After her surgery, Ms. Veurink had three post-operative visits with Dr. Murphy in November 2016, December 2016, and February 2017. Veurink Dep. 86:19-21; 87:1-4. During her February 2017 visit, Ms. Veurink told Dr. Murphy that she was not happy with the size of her breasts and that she still fit her DD bras. Veurink Dep. 88:18-22. When Dr. Murphy inquired what size she wanted to be, Ms. Veurink replied that as they had discussed in her November 1, 2016, visit, she had wanted to be a large B/small C. Veurink Dep. 88:18-22. Dr. Murphy's medical notes from the February 2017 visit confirm that Ms. Veurink told her she was still fitting in her DD bra, was unhappy with the size of her breasts, and that she wanted to be smaller, a size B/C. Preheim Aff., Ex. 6.

On or around March 14, 2017, Ms. Veurink submitted a letter to Avera Health Plans stating that she did not believe she had received a breast reduction and did not think that her insurance company should have compensated PSA for a breast reduction. Veurink Aff., Ex. B. Ms. Veurink stated that the surgical notes stated that 101 grams and 121 grams of tissue were removed from the right and left breasts respectively and further stated that she believed that Dr. Murphy's addendum to the surgical report, estimating that greater than or equal to 350 grams of tissue was removed from each breast, was fabricated in order to have insurance retro-authorize the procedure. Veurink Aff., Ex. B. Both Ms. Pierret and Dr. Murphy testified that they had not realized REAS had actually weighed the breast tissue that had been removed during Ms. Veurink's surgery until they received a letter from Ms. Veurink referencing the weight of the tissue documented in the surgical report. Pierret Dep. 127:5-10; 128:17-22.

After receiving Ms. Veurink's complaint, Avera Health Plans conducted a review and determined that Ms. Veurink's records showed that a breast reduction was not performed, and only a breast lift was completed. Veurink Aff., Ex. B. Accordingly, PSA refunded to Avera Health Plans the money it received for Ms. Veurink's breast surgery. Pierret Dep. 115:16-20. Ms. Veurink has not repaid PSA the amounts that she was refunded for her insurance company's coverage of her breast surgery. Pierret Dep. 115:21-24.

On February 16, 2018, Ms. Veurink filed a complaint against Dr. Murphy and an amended complaint on July 3, 2018, alleging claims for medical negligence, and fraud and deceit. Docs. 1, 15. In her claim for relief, Ms. Veurink seeks the following damages resulting from Dr. Murphy's alleged unlawful conduct: 1) past and future medical expenses; 2) past and future physical, mental, and emotional pain and suffering; 3) past and future loss of bodily function; 4) past and future loss of enjoyment of life; 5) lost wages and other consequential financial damages; 6) punitive damages; and 7) interest. In the event that the jury's verdict exceeds the statutory maximum allowed for medical malpractice claims under SDCL § 23-3-11, Ms. Veurink seeks a ruling by the Court declaring SDCL § 21-3-11 unconstitutional on its face or as applied to this case.

On March 15, 2019, Dr. Murphy filed a Motion for Partial Summary Judgment on Ms. Veurink's fraud and deceit claim. Doc. 23. The motion has been fully brief by the parties and the Court held oral argument on the motion on May 20, 2019, and again on June 17, 2019.

## DISCUSSION

Dr. Murphy argues that she is entitled to summary judgment on Ms. Veurink's claim for fraud and deceit based on several different grounds. The Court will address each of Dr. Murphy's arguments in turn.

**I. May Dr. Murphy's alleged misrepresentations about what she intended to do at the time of surgery give rise to liability for fraud?**

Generally, "[a]n actionable misrepresentation must relate to a past or existing fact and not a future event." *Sperry Corp., Sperry New Holland Div. v. Schaeffer*, 394 N.W.2d 727, 730 (S.D. 1986) (citing *Reitz v. Ampro Royalty Trust*, 61 N.W.2d 201 (S.D. 1953)). "'A party cannot justifiably rely upon conjecture about future events,' . . . [because] the future cannot be foreseen or guaranteed." *Bayer v. PAL Newcomb Partners*, 643 N.W.2d 409, 413-14 (S.D. 2002) (quoting *Gatz v. Frank M. Langenfeld & Sons Constr. Inc.*, 356 N.W.2d 716, 718 (Minn. Ct. App. 1984)).

Dr. Murphy argues that any alleged fraudulent statements made by Dr. Murphy to Ms. Veurink on November 1, 2016, about what she intended to do at the time of the surgery "are statements of a future event and cannot, as a matter of law, give rise to liability for fraud." Def.'s Br. at 13. Specifically, Dr. Murphy characterizes her statements as "promise[s] of a certain outcome" which, she argues, do not constitute a representation of fact.

In support of her argument, Dr. Murphy cites *Lovely v. Percy*, 826 N.E.2d 909 (Ohio Ct. App. 2005) involving a patient's claim for fraud against a plastic surgeon arising out of a breast augmentation procedure. There, the patient alleged that she had informed her plastic surgeon that she wanted her breast size increased to a size 34C and that the plastic surgeon had assured her that the surgery would accomplish that goal. *Id.* at 910-11. The plaintiff alleged that her breast size after surgery was less than a 34B and as a result, commenced an action against the surgeon alleging claims including fraud and malpractice. *Id.* at 911. The court affirmed the trial court's dismissal of the plaintiff's fraud claim on the basis that the surgeon's alleged promises of a certain outcome relate to a future action or conduct and do not constitute a representation of fact sufficient to give rise to a fraud claim. *Id.* at 914.

In response to Dr. Murphy's arguments, Ms. Veurink argues that Dr. Murphy's statements that she was going to perform a breast reduction and remove 250-350 grams per breast are not promises of a certain surgical outcome, but rather are statements of fact that Ms. Veurink would perform a certain procedure—a breast reduction, and not just a breast lift. Plf.'s Br. at 18. Defendant argues that Dr. Murphy's statements fall within the exception to the general rule that misrepresentations as to future events are not actionable because "the misrepresentation of [the] future occurrence is made by one who purports to have superior knowledge of the matter." Plf.'s Br. at 18 (citing *Sperry Corp.*, 394 N.W.2d at 730). Ms. Veurink argues that she should have been able to rely on the representations by Dr. Murphy as to the type of procedure she would perform because Dr. Murphy, a board-certified plastic surgeon, has superior knowledge of the matter. Ms. Veurink is a registered nurse, but her current work is in cardiac care.

The Court concludes that the allegations surrounding Dr. Murphy's alleged misrepresentations are more appropriately characterized, not as statements of fact concerning a future event, but rather as statements of Dr. Murphy's present intention. In *Cohen v. Northwestern Growth Corp*, 385 F. Supp. 2d 935, 958-59 (D.S.D. 2005), the plaintiffs alleged that the defendants misrepresented that an initial public offering ("IPO") of a company would occur when in fact the defendants had no intention of pursuing an IPO, regardless of future events. This Court stated that the defendant's representation was not conjecture about future events, but regarded defendant's present intention, and therefore fell within the definition of deceit as stated in SDCL 20-10-2[3]. *Id.*

---

[3] SDCL 20-10-2 defines acts constituting deceit as:

10

at 959. Ms. Veurink argues in her brief that Dr. Murphy "knew that she was not going to perform a breast reduction and intended to deceive Ms. Veurink into thinking that she would." Plf.'s Br. at 23. Similar to the plaintiff's allegations in *Cohen*, Ms. Veurink's allegations regard Dr. Murphy's present intention and may thus give rise to liability for fraud.

Even if Dr. Murphy's representations about her intention to perform a breast reduction are found to concern a future event, the Court agrees with Ms. Veurink that she could justifiably rely on Dr. Murphy's superior knowledge about what surgery she was going to perform.

For the foregoing reasons, the Court concludes the alleged misrepresentations made by Dr. Murphy to Ms. Veurink about what she intended to do at the time of surgery may give rise to liability for fraud, so at this stage of the proceedings a jury issue is presented.

## II. Does Ms. Veurink's claim for fraud and deceit fall within the purview of a medical malpractice claim under South Dakota law?

While the South Dakota Supreme Court appears to recognize that a plaintiff may, in some instances, pursue a fraud claim against a professional independent of a claim for malpractice, the Court has made clear that a plaintiff may not, through artful pleading, characterize a malpractice action as one for fraud and deceit. *Masloskie v. Century 21 Am. Real Estate, Inc.*, 818 N.W.2d 798, 803 (S.D. 2012).

In the present case, Dr. Murphy contends that Ms. Veurink's fraud claim sounds not in fraud, but in negligence.

### A. *Bruske* and *Masloskie* Decisions

In *Bruske v. Hille*, 567 N.W.2d 872, 877 (S.D. 1997), the South Dakota Supreme Court concluded that the plaintiff's claim for fraud and deceit was actually a claim for medical malpractice, and was thus barred by the two-year limitations period for medical malpractice claims. There, the plaintiff had undergone a procedure for TMJ that involved the placement of an oral implant. *Id.* at 874. A few years after the surgery, the defendant began notifying his patients

---

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
(3) The suppression of a fact by one who is bound to disclose it, or who give information of other facts which are likely to mislead for want of communication or that fact; or
(4) A promise made without any intention of performing.

11

of problems with the implant and urged them to come in for treatment, but failed to notify the plaintiff. *Id.* The defendant had testified during his deposition that when the patient had sued him a couple of years prior, her file was moved to a fireproof cabinet and therefore was not with the other records when patient files were reviewed for implant warnings. *Id.* In her fraud claim, the plaintiff had alleged that the defendant had intentionally declined to send her a warning letter because of her prior lawsuit against him. *Id.* at 876.

In determining whether the plaintiff's fraud claim was actually a claim for medical malpractice, the court looked at whether the plaintiff had, in fact, satisfied all of the elements of fraud and examined the gravamen of the plaintiff's cause of action. *See id.* at 876. The Court stated that the plaintiff had not shown the defendant had acted "within intent to induce [her] to alter [her] position to [her] injury or risk." *Id.* (quoting SDCL § 20-10-1) (alterations in original). The Court found the plaintiff's allegations—that the defendant had intentionally declined to send her a warning letter because of her prior lawsuit against him—were conclusory and insufficient, but went on to evaluate whether the plaintiff's claims sounded in negligence or fraud given the Court's duty at the summary judgment stage to view the patient's case in the light most favorable to her. *Id.* Most importantly, the Court found that the source of the defendant's duty rested not upon SDCL § 20-10-2(3) ("suppression of a fact by one who is bound to disclose it"), but rather upon the duty to meet the standard of care by timely notifying the patient of the danger of the implants. Accordingly, the court found that the plaintiff's claim was cognizable as a claim for medical malpractice under South Dakota law and was thus barred by the two-year limitations period governing such actions. *Id.* at 876-77.

Subsequent to *Bruske*, in *Masloskie v. Century 21 Am. Real Estate, Inc.*, 818 N.W.2d 798 (S.D. 2012), the South Dakota Supreme Court again had an opportunity to examine whether claims of negligent and fraudulent misrepresentation were in "essence" claims for malpractice subject to the malpractice statute of limitations. There, the plaintiffs' fraudulent and negligent misrepresentation claims were based on alleged misrepresentations made to them by a realtor that, based on his discussions with the power company and others (discussions, which, in fact, never occurred), plaintiffs would be able to connect to a power pole on a property owned by the Forest Service adjacent to the property they were interested in purchasing. *Id.* at 799.

12

The Court applied the analysis in *Bruske* and concluded that contrary to the plaintiff in *Bruske*, the plaintiffs' cause of action in *Masloskie* sounded in fraud. *Id.* at 803. The Court stated that while the plaintiff's claims in *Bruske* were based on her expert's opinion that the defendant had a "duty to warn" the plaintiff of the defective implant, and while the plaintiff in *Bruske* failed to present sufficient evidence of intent to deceive, the plaintiff's allegations in *Masloskie* of fraudulent misrepresentation could, if proven, establish actual fraud as well as negligent misrepresentation." *Id.* at 801, 803. The Court stated that given that the gravamen of the plaintiffs' claims was based in fraud as much as in negligence, and that doubt regarding the applicable statute of limitations must be resolved in favor of the longer period, it concluded that the plaintiffs' claims were actionable under the statute of limitations applicable to fraud actions. *Id.* at 803.

### B. Application of *Bruske* and *Masloskie* to the Facts of this Case

As discussed in the *Bruske* and *Masloskie* decisions, in determining whether a claim sounds in negligence or fraud, a court must examine whether the source of the defendant's duty lies in the physician-patient relationship or upon the fraud statute. *See Bruske*, 567 N.W.2d at 876; *Masloskie*, 818 N.W.2d at 803. In *Bruske*, the Court concluded that the plaintiff's claims sounded in negligence because the plaintiff's claim was based on her expert's opinion that the implant defect was known in the oral surgery profession and that the defendant therefore had a duty to warn the plaintiff of the defect. *Bruske*, 567 N.W.2d at 876; *Masloskie*, 818 N.W.2d at 803 (discussing the Court's analysis in *Bruske*).

Dr. Murphy contends that there is no dispute that Dr. Murphy performed a breast reduction, because 101 grams and 121 grams of breast tissue were removed from Ms. Veurink's right and left breasts, respectively. Dr. Murphy argues that Ms. Veurink's claim is one for malpractice because it is based on her expert's opinion that Dr. Murphy did not meet the standard of care because "the amount of breast tissue that was removed is less than the amount of tissue Dr. Murphy had 'promised' Veurink she would remove." Def.'s Br. at 9-10; Def.'s Reply Br. at 8 ("[T]his case is not whether Dr. Murphy performed a breast reduction, but rather, [whether] Dr. Murphy performed enough of a breast reduction to meet the patient's expectations."). In support of her argument, Dr. Murphy points to deposition testimony by Ms. Veurink's expert, Dr. Steele, where he expressed his opinion as to whether Dr. Murphy breached the standard of care in performing Ms. Veurink's breast surgery as follows:

13

> My opinion is that the patient was primarily concerned about her symptomatology for neck pain/back pain-related symptoms. And she specifically wanted a breast reduction, not necessarily for cosmetic purposes, this was more of a functional issue. And the patient feels like she did not get the procedure that she asked Dr. Murphy to perform.

Def.'s Br. at 10 (citing Steele Dep. 105:5-25). Additionally, Dr. Murphy cites Dr. Steele's medical notes from Ms. Veurink's initial consultation with him stating that Ms. Veurink "[h]ad a mastopexy, removing about 100 grams per side [and that] [s]he is disappointed, *wanted to have more of a reduction*." Def.'s Reply Br. at 10 (citing Hinton Supp. Aff. 3 & Ex. 2 (Veurink 56)). Dr. Murphy argues that because expert testimony is required to determine whether Dr. Murphy removed enough breast tissue to constitute a breast reduction, that Ms. Veurink's claim is one for medical malpractice. Def.'s Reply Br. at 6-7.

While expert testimony may required to determine whether Dr. Murphy performed a breast reduction (and therefore whether she made an untrue representation), this alone does not mean that Ms. Veurink's claim sounds in negligence. The Court finds this case distinguishable from *Bruske*. In *Bruske*, the plaintiff's claims were based on her expert's opinion that the defendant had a duty to warn her of the defective implant and breached the standard of care in failing to do so. In this case, no expert is needed to establish that Dr. Murphy had a *duty* to perform the surgery she said that she was going to perform. Because Dr. Murphy's duty arises outside the standard of care, the Court concludes that Ms. Veurink's claim sounds in fraud and falls outside the purview of a medical malpractice claim.

### III. Has Ms. Veurink Satisfied the Elements of a Fraud and Deceit Claim?

Dr. Murphy argues that even if Ms. Veurink's claim "sounds in fraud," that she has not met all of the elements of fraud.

Under South Dakota law, a fraud claim is established by proving:

1) A defendant made a representation as a statement of fact;
2) The representation was untrue;
3) The defendant knew the representation was untrue or she made the representation recklessly;
4) The defendant made the representation with intent to deceive the plaintiff and for the purpose of inducing the plaintiff to act upon it;
5) The plaintiff justifiably relied on the representation;
6) The plaintiff suffered damage as a result.

14

South Dakota Pattern Jury Instructions Civil 20-110-20 (2018); *Delka v. Cont'l Cas. Co.*, 748 N.W.2d 140, 152 (S.D. 2008).

### i. Statement of Fact

The Court has already addressed this element in the opinion, *see supra I.*, and concludes that Dr. Murphy's representation that she was going to perform a breast reduction is a statement of fact that may give rise to a liability for a fraud claim.

### ii. Untrue Misrepresentation

Dr. Murphy appears to argue that it is undisputed that Dr. Murphy performed a breast reduction and therefore Veurink has failed to prove that Dr. Murphy made any untrue promise or misrepresentation.

While Dr. Murphy states in her deposition testimony that she did perform a breast reduction[4] because she removed at least some amount of "breast tissue," Ms. Veurink's expert, Dr. Steele, testified that Dr. Murphy performed a mastopexy, not a breast reduction. Accordingly, there is a question of material fact as to whether Dr. Murphy made an untrue representation.

### iii. Knowledge of Untrue Statement, Intent to Deceive, Justifiable Reliance

Dr. Murphy argues that even if her statement was untrue in that she did not perform a breast reduction, there is no evidence that at the time she allegedly told Veurink that she was going to perform a breast reduction, that she never intended to do so or that she made the alleged statements to Veurink with the intent to deceive Veurink and induce Veurink to undergo surgery. Def.'s Br. at 19. Dr. Murphy alleges that Ms. Veurink "must proffer some evidence that when Dr. Murphy documented in the November 1, 2016 clinic note that she expected to be able to remove 250-350 grams that Dr. Murphy did not intend to do so." Def.'s Br. at 19.

Ms. Veurink argues that Dr. Murphy knew that she was not going to perform a breast reduction and intended to deceive Ms. Veurink into thinking that she would. In support of her argument that Dr. Murphy intended only to perform a breast lift, Ms. Veurink stated that (1) Dr. Murphy testified that she only performs a breast reduction if insurance has pre-authorized it

---

[4] It should be noted that Dr. Murphy's expert also states the Dr. Murphy performed a mastopexy, but that Ms. Veurink signed a consent form for a mastopexy.

15

(Murphy Dep. 81:25-83:5 (explaining that "the amount of tissue that we would have taken out would likely have been different" if the insurer had authorized the procedure); and (2) Dr. Murphy never intended to process Ms. Veurink's breast surgery claim through insurance (Murphy Dep. 210:17-20 ("I said we didn't do this with the intention of sending it to insurance.")). Ms. Veurink also argues that Dr. Murphy had direct financial incentive to tell Ms. Veurink that she was going to perform a breast reduction in order to keep her engaged as a customer or risk losing her business, which included an abdominoplasty and hernia repair. Plf.'s Br. at 26. By only performing a breast lift/mastopexy and not a reduction, Ms. Veurink argues that Dr. Murphy ensured that Ms. Veurink would need another surgery that would actually reduce the size of her breasts which would result in even more money for Dr. Murphy. Plf's Br. at 26. That last argument is speculation not based in reality. If Dr. Murphy did not do the requested breast reduction in the first surgery, so that a second breast reduction surgery was necessary to get the desired result, Dr. Murphy would know it was highly unlikely that the patient would have her do the second surgery.

While summary judgment should be granted with caution where intent is at issue, it may be appropriate if the non-moving party rests only on "conclusory allegations, improbable inferences, and unsupported speculation." *See Demerath Land Co. v. Sparr*, 48 F.3d 353, 355 (8th Cir. 1995) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)); *see also Roper v. Noel*, 143 N.W. 130, 132 (S.D. 1913) (stating that when "the connection of [defendant] with the fraud and deceit, if any, rests solely upon conjecture . . . [a] case should not be submitted to the jury."). "[F]raud and dishonesty may never be presumed and left to mere speculation or conjecture." *Estate of Elliott ex rel. Elliott v. A & B Welding Supply Co. Inc.*, 594 N.W.2d 707 (S.D. 1999) (citing *Roper v.* Noel, 143 N.W. 130, 132 (S.D. 1913)); *Gen. Finance Corp. v. Fidelity & Cas. Co. of New* York, 439 F.2d 981, 986 (8th Cir. 1971).

Ms. Veurink argues that Dr. Murphy had direct financial incentive to tell Ms. Veurink that she was going to perform a breast reduction in order to keep her engaged as a customer or risk losing her business, which included an abdominoplasty and hernia repair. Plf.'s Br. at 26. In addition, Ms. Veurink argues that by only performing a breast lift/mastopexy and not a reduction, Dr. Murphy ensured that Ms. Veurink would need another surgery that would actually reduce the size of her breasts which would result in even more money for Dr. Murphy. Plf's Br. at 26. The Court has already found that latter argument to be speculative. The parties testified that Dr.

16

Murphy's income as partner was based upon a percentage of the professional fees she received from her surgeries. Ms. Veurink argues that the professional fees that Dr. Murphy would receive were higher if Ms. Veurink's surgery was billed as a breast reduction through insurance.

It is true that the professional fee that Dr. Murphy billed through insurance was $10,000 for the breast reduction, whereas her professional fee that she initially quoted Ms. Veurink for the mastopexy was $4,250 less a multiple procedure discount of 50%. However, pursuant to PSA's contract with Ms. Veurink's insurance company, Avera Health Plans, PSA was required to write off a certain portion of their professional fees. In this case, PSA was permitted to bill $3,553.94 in professional fees for Ms. Veurink's breast reduction which is less than the professional fees of $4,250 initially quoted to Ms. Veurink for a mastopexy paid by Ms. Veurink out-of-pocket. Ms. Pierret testified that Dr. Murphy's compensation would have been based on the $3,553.94 in professional fees that was approved by the health insurance company, not the $10,000 sticker price for the procedure.

While the Court finds some of Ms. Veurink's arguments that Dr. Murphy had financial motives to mispresent the surgery she was going to perform to be speculation, "[i]t is well settled that in order to render one liable for damages in an action for deceit, it is not necessary that [Dr. Murphy] derive any benefit from the deception."

Although Dr. Murphy contends that Ms. Veurink must proffer some evidence of a Dr. Murphy's intent to deceive, a plaintiff need not prove fraud by direct and positive evidence. *Funke*, 102 N.W.2d at 670. "Like all other issues of fact it may be established by inference arising from the facts and circumstances in evidence." *Id.*

Viewing the facts and the circumstances in the light most favorable to Ms. Veurink, the non-moving party, the Court finds that a reasonable trier to fact could conclude, that at the time Dr. Murphy allegedly represented to Ms. Veurink that she was going to perform a breast reduction and remove 250-350 grams per breast, she intended only to perform a breast lift, and that Dr. Murphy made such representations with intent to deceive Ms. Veurink and for the purpose of inducing Ms. Veurink to proceed with all of the surgeries. Dr. Murphy testified that she had estimated that she would have to remove 250-350 grams from each of Ms. Veurink's breasts in order for Ms. Veurink's insurance company to cover the procedure. Dr. Murphy also testified that if the insurance company did not cover the procedure, that the amount of breast tissue removed

17

would not be dictated by insurance company minimums, but rather by what the patient's goal is. There is ample evidence in the record to permit a juror to reasonably conclude that during her November 1, 2016, appointment, Ms. Veurink expressed her desire for a breast reduction to alleviate her symptoms. Dr. Murphy testified "the vast majority of women, including [Ms. Veurink] want to be proportional, right in the middle, not too big, not too small." Dr. Steele testified that the mastopexy performed by Dr. Murphy accomplished this goal and that Ms. Veurink's breast size post-surgery was, in his opinion, proportional to her frame. However, Ms. Veurink testified that she still wears the same DD bras post-surgery that she did pre-surgery and continues to experience pain and sores associated with her large breast size. A jury will decide what was requested and what Dr. Murphy intended to provide and did provide.

Dr. Murphy and her staff at PSA never submitted the insurance pre-authorization form to the insurance company before Ms. Veurink's surgery. Because they had not obtained pre-authorization, Dr. Murphy was not required to remove the 250-350 grams of tissue per breast that she estimated would need to be removed in order for the procedure to be covered by insurance. Even if they had submitted the pre-authorization to insurance on November 1, 2016, the day of Ms. Veurink's follow-up appointment with Dr. Murphy, Dr. Murphy would have no expectation that they would receive pre-approval before Ms. Veurink's scheduled surgery 2 days later on November 3, 2016, since it typically took the insurance company 10-15 days to process the pre-authorization. A reasonable juror could infer from these facts that Dr. Murphy never had any expectation that she would perform a breast reduction and remove 250-350 grams of tissue per breast, but instead intended to perform a mastopexy to keep Ms. Veurink proportional to her frame.

It is undisputed that at her November 1, 2016, appointment, that Ms. Veurink sought and received confirmation from Dr. Murphy that she would be receiving a breast reduction. Dr. Murphy contends that a breast reduction was, in fact, performed. Dr. Steele testified that typically, breast reductions involve the removal of about 300-800 grams of breast tissue for symptom relief. Dr. Steele testified further that although Dr. Murphy may have removed a small amount of breast tissue in order to close the incisions, the 100 and 121 grams that she removed from Ms. Veurink's respective right and left breasts, was mostly skin and that Dr. Murphy performed a mastopexy or breast lift.

Certainly, there will be expert testimony as to whether a breast reduction was in fact performed. If the jury finds that a breast reduction was not performed, then it will have to determine whether Dr. Murphy willfully ignored Ms. Veurink's request for a breast reduction or just simply misunderstood Ms. Veurink's expectations. The Court finds that there is sufficient evidence in the record to permit a reasonable juror to make either inference. A finding by a jury that Dr. Murphy willfully ignored Ms. Veurink's expectation for a breast reduction, may also lead it to conclude that when Dr. Murphy represented to Ms. Veurink that she would perform a breast reduction that she did so with intent to deceive Ms. Veurink and for the purpose of inducing Ms. Veurink to proceed with all of the surgeries.

Overall, viewing the facts most favorably to Ms. Veurink and making all reasonable inferences in her favor as the Court is bound to do at this summary judgment stage, the Court concludes that a reasonable juror could infer that Dr. Murphy misrepresented the surgery she was going to perform with an intent to deceive Ms. Veurink and induce her to undergo the surgeries.

### A. Damages

In her brief, Veurink alleges that she would not have undergone surgery with Dr. Murphy and paid her and PSA over $10,000 for her surgical procedures if Dr. Murphy had not mispresented her intention to perform a breast reduction. The general measure of damages for a breach of an obligation not arising from contract "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." *Biegler v. Am. Family Mut. Ins. Co.*, 621 N.W.2d 592, 64-05 (quoting SDCL § 21-3-1).

Ms. Veurink may be entitled to recover the out-of-pocket expenditures she made in reliance upon Dr. Murphy's alleged misrepresentations if she succeeds on her fraud claim.

Accordingly, it is hereby ORDERED that Dr. Murphy's Motion for Partial Summary Judgment, Doc. 23, is DENIED.

Dated this 25th day of June, 2019.

BY THE COURT:

*Lawrence Piersol* (signature)
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THIELEN, CLERK

*Matthew Thielen* (signature)